Marilyn KILLINGHAM, Appellant,

v.

WILSHIRE INVESTMENTS
CORPORATION,
Appellee.

No. 97–CV–457.

District of Columbia Court of Appeals.

Submitted Jan. 28, 1999.
Decided Sept. 30, 1999.

Marilyn Killingham, pro se.

Gary G. Everngam, Bethesda, MD, submitted a brief for appellee.

Before TERRY, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

In this landlord and tenant action, Marilyn Killingham appeals from a jury verdict which, while abating somewhat the back rent she owed, awarded possession of her apartment to her landlord, Wilshire Investments Corp. (hereafter the Landlord), as well as a money judgment of $1295.87 plus costs to the Landlord. On appeal, Killingham's primary arguments relate to the trial judge's decisions permitting the Landlord to amend its complaint to exclude a claim for back rent for an apartment unit she no longer occupied, and correspondingly refusing to let her introduce evidence of housing code violations for the unit no longer occupied. We reject these and the remainder of her contentions, and affirm.

## I.

At the time of trial, Ms. Killingham had resided in the Marina View Apartments since 1984, successively occupying apartments 507, 609, and 510. While occupying apartment 609, Killingham paid monthly rent of $550 [1] until April 1994 when she effectively stopped paying her rent, claim-

---

1. Because she participated in the District of Columbia's Tenant Assistance Program ("TAP"), she personally paid $217 of the monthly rent while TAP paid the balance. TAP had apparently paid its portion of the rent in full at all times.

ing that the Landlord had failed to correct violations of the housing code. On October 12, 1994, in response to her complaints, the Landlord permitted her to relocate to apartment 510. In September 1995, the Landlord filed suit for summary possession and back rent in the Landlord & Tenant Branch of Superior Court, claiming a rent arrearage of $3541. Because Killingham had previously filed administrative proceedings challenging a requested increase in the rent ceiling, she moved for and was granted a stay of the court proceedings under *Drayton v. Poretsky Management*, 462 A.2d 1115 (D.C.1983). After the stay was lifted to permit the Landlord to proceed with its suit based on the existing rent level (*i.e.*, minus the challenged increase), Killingham answered the complaint and filed a counterclaim for damages, in which she asserted, *inter alia*, multiple breaches of the implied warranty of habitability going back to 1992.

On January 22, 1997, the Landlord moved to amend the complaint asserting that its claim for back rent had mistakenly included rent for the unit no longer occupied by Killingham (609). It asked that the complaint be made to reflect only "the correct time and the correct amount of rent due from October 12, 1994 for unit # 510." The Landlord explained its delay in discovering the error by pointing to the *Drayton* stay, which had drawn its attention away from the court case. The Landlord further moved to dismiss Killingham's counterclaim for damages other than as related to apartment 510, pointing out that the Landlord no longer sought to enforce her obligation to pay rent before October 1994 so long as she did not sue independently for damages relating to her occupancy during that period. The Landlord argued that, in light of its relinquishment of any claim for rent related to apartment 609, Super. Ct. L & T R. 5(b) barred any defense with respect to that unit, since the rule requires defenses and counterclaims to summary possession actions to be "based on the payment of rent or on expenditures claimed as credits against rent

or for equitable relief *related to the premises*" (emphasis added). Killingham opposed the motion to amend and to dismiss her counterclaim by asserting that the Landlord had shown bad faith and inexcusable delay, and that she would be prejudiced if the motions were granted because, under the applicable three-year statute of limitations, she would be barred from suing independently for damages related to her occupancy before 1994 at a time when she was still paying the rent. She further argued that the Landlord's "premises" argument under Rule 5(b) was invalid because she had signed no new lease in moving to apartment 510, so that neither her leasehold nor the "premises" had in fact changed.

The trial judge granted the Landlord's motions, finding that "[a]ny prejudice to [Killingham in permitting amendment] was minimal," because the landlord "has stipulated that it will not sue [her] for unpaid rent from April 1, 1994 through October 12, 1994 unless [she] brings an affirmative action against plaintiff for damages or excess rent relating to her occupancy of her previous apartment." "Moreover," the judge said, "granting the [Landlord] leave to amend will not leave [Killingham] without a remedy" because she "may, if she chooses, reassert the portion of her counterclaim that is cut off in an affirmative action against the plaintiff in the Civil Division of the court." The judge added:

> Although a counterclaim in a landlord and tenant action for possession can relate to a period which precedes the alleged non-payment of rent (*Hines v. John B. Sharkey Co.*, 449 A.2d 1092 (D.C.1982)), it must relate to the premises. *See* Super. Ct. L & T R. 5(b); *Campos v. Aguila*, 464 A.2d 132 (D.C. 1983). If plaintiff's claim is limited to alleged non-payment of rent for unit 510 from October 12, 1994 to the present, defendant's counterclaim for the period preceding October 12, 1994 would relate neither to the alleged unpaid rent nor to the premises.

Thus, the complaint was amended, and Killingham's counterclaim and defense regarding the housing conditions in apartment 609 were dismissed from the action.

## II.

Killingham argues that the judge abused his discretion in allowing amendment of the Landlord's complaint, and that even if the amendment was proper, he erred in dismissing her counterclaims and refusing to let her introduce evidence of housing code violations related to apartment 609. We consider these issues in turn.

### A.

■ Super. Ct. Civ. R. 15(a), made applicable to the Landlord & Tenant Branch by Super. Ct. L & T R. 2, provides that leave of the court to amend a party's pleading "shall be freely given when justice so requires." It "is drafted to ensure that litigation be decided upon the merits rather than upon technical pleading rules." *International Tours & Travel, Inc. v. Khalil,* 491 A.2d 1149, 1152 (D.C.1985). "The discretion accorded the trial court in deciding a motion for leave to amend is to be considered together with the prevailing spirit of liberalism in allowing such amendments when justice will be so served." *Eagle Wine & Liquor Co. v. Silverberg Elec. Co.,* 402 A.2d 31, 34 (D.C.1979). Nevertheless, the trial judge should "refuse to allow an amendment ... where it is evident that the amendment would be accompanied by undue delay, bad faith or dilatory motive on the part of the movant or undue prejudice to the opposing party." *Blake Constr. Co. v. Alliance Plumbing & Heating Co.,* 388 A.2d 1217, 1220 (D.C. 1978) (internal quotation marks and citation omitted).

■ Killingham argues, as she did below, that the Landlord's sixteen month delay in moving to amend the complaint represented a bad-faith attempt to defeat her counterclaims once the Landlord learned of the strength of her defenses through discovery. The trial judge implicitly rejected this argument, and we have no reason to disturb that ruling. The ten-month *Drayton* stay, as well as additional postponements attributable to Killingham's illnesses, could reasonably have diverted the Landlord's attention from the case and caused it to overlook the fact that the complaint, although listing only apartment 510 as the subject of the action, included in the rent arrearage an amount for an apartment the tenant no longer occupied. Consequently, unless there was "undue prejudice" to Killingham from the amendment, the judge did not abuse his discretion in permitting it. For three combined reasons, we agree with Judge Weisberg's finding that any prejudice to Killingham was "minimal."

First, as the judge pointed out, by the requested amendment the Landlord actually agreed to release Killingham from almost seven months of rent that she undisputably had not paid. Specifically, it stipulated to the release of $1519 of her rental obligation provided she did not sue in the Civil Division for breach of the implied warranty of habitability during that same period. Second, if Killingham had refiled the counterclaim as a suit at the time the judge allowed the amendment, the statute of limitations would not have barred her from litigating a principal component of the damages she alleged, *viz.,* the March 1994 rupture of a hot water pipe above her bed which allegedly had destroyed her personal property and made the apartment uninhabitable.[2] Third, as to the time-barred claims themselves (which Killingham appears to have estimated at a maximum of $5885), exam-

---

2. We note that had Killingham refiled her claim in the Civil Division, she would then have been able to seek damages for the loss of her personal property, an amount that could not have been claimed in the Landlord and Tenant Branch. *See Campos v. Aguila,* 464 A.2d 132, 133 (D.C.1983) (citing *Hines v. John B. Sharkey Co.,* 449 A.2d 1092, 1093 n. 3 (D.C.1982), and *Miles Realty Co. v. Garrett,* 292 A.2d 152, 153 (D.C.1972)).

ination of the record reveals that all of the housing code violations she claimed during the time-barred period were also alleged to have continued during the occupancy of apartment 510, and were evaluated by the jury within that framework.[3] Yet, although examining a much longer period of nearly twenty-nine months (October 1994 to February 1997), and taking into account the same violations claimed for the seventeen month time-barred period, the jury awarded Killingham only $1627.50 in rent abatements. This may reasonably be viewed as an objective indicator (on the high end) of the value of the time-barred claims. Accordingly, the loss of that value is offset by the $1519 in rent for apartment 609 to which the Landlord—absent amendment—would have been entitled if Killingham failed to prove the claimed code violations.

In sum, although the trial court's decision would have been less vulnerable to challenge had he conditioned amendment on the landlord's waiver of the statute of limitations defense, we conclude that the decision to allow amendment was not an abuse of discretion.

### B.

■ Killingham further argues that even if the amendment of the complaint was proper, the judge erred in dismissing her counterclaims and refusing to let her present evidence of the uninhabitability of apartment 609. Landlord & Tenant Rule 5(b), as pointed out earlier, provides that all counterclaims and defenses in the Landlord and Tenant Branch must be "based on the payment of rent or on expenditures claimed as credits against rent or for equitable relief related to the premises." In this case, Judge Weisberg read "premises" to mean only the apartment and common areas Killingham occupied and used during the period for which the Landlord sought back rent, not an apart-

ment she no longer occupied and for which no back rent was being sought. Killingham, in contrast, argues that "premises" should be understood to mean the entire building and curtilage, as the term is defined by the housing code. *See* 14 DCMR § 199.1 (1991). Although we have not had occasion to construe the term as used in Rule 5(b) in a context such as this, we are convinced that the trial judge's interpretation was correct.

■ Rule 5(b)'s restriction of counterclaims and defenses to those based on payment of rent "related to the premises" goes back to the Circuit Court's recognition in *Javins v. First National Realty Corp.,* 138 U.S.App. D.C. 369, 428 F.2d 1071 (1970), that, although "the Housing Regulations imply a warranty of habitability, measured by the standards which they set out, into leases of all housing that they cover," code violations, "[t]o be relevant[,] . . . must affect the tenant's apartment or common areas which the tenant uses." *Id.* at 380 & n. 62, 428 F.2d at 1082 & n. 62. Defenses and counterclaims "not based on the payment of rent or related to the premises," as thus defined, are not permitted in the summary proceedings held in the Landlord and Tenant Branch. *Campos, supra* note 2, 464 A.2d at 133 (internal quotation marks and citations omitted). "[P]remises" as used in Rule 5(b) must be understood in accordance with the simplified procedures of that branch, which are "designed to insure an expeditious resolution of landlord-tenant disputes." *Id.* Interpreting "premises" to mean any apartment in the same building (or, indeed, complex of buildings) which the tenant no longer occupies and for which she owes no rent would sweep within the rule a much broader class of defenses than the rule contemplates. *See generally Barnes v. Scheve,* 633 A.2d 62, 64 (D.C.1993) ("The rules governing the Landlord and Tenant

---

**3.** These included, to cite a few, the claims that her refrigerator leaked, there was rodent infestation of the common laundry room, natu- ral gas service had been "intermittent," the building entrance door was non-functional, and the elevators frequently broke down.

Branch narrowly and specifically limit its reach").

In other respects as well we have recognized the need to interpret Rule 5(b) restrictively. *See Millman Broder & Curtis v. Antonelli,* 489 A.2d 481, 484 (D.C.1985) ("the mere fact that a counterclaim is related to the premises does not permit such matter to be raised under Rule 5(b) unless based upon a payment or credit against rent"); *Miles Realty, supra* note 2, 292 A.2d at 153 (Rule 5(b) "does not permit the filing of a counterclaim for damages to the tenant's personalty," but rather allows only "claim[s] of payment of rent, or expenditures, or for equitable relief"). Although, at the same time, we have held that suitable "counterclaim[s] under Super. Ct. L & T R. 5(b) [may be based] on housing code violations that predate the period for which the landlord claims rent is due,". *Hines, supra* note 2, 449 A.2d at 1095, we decline to extend that principle to violations unrelated to "the tenant's apartment or common areas which [she] uses," *Javins, supra,* and for which the Landlord does not seek back rent.

█ Killingham further argues that she had only a single "leasehold" despite her move from apartment 609 to 510 because she did not sign a new lease upon moving. That does not alter the fact that her claims of uninhabitability of apartment 609 did not relate to the premises she now occupied and for which alone back rent was being sought. Moreover, since the record contains no copy of Killingham's lease, we cannot rule out the possibility—indeed, the probability—that the lease she had signed was specific to apartment 609, resulting in the constructive creation of a periodic tenancy when she moved to apartment 510.[4] In that case, any breach of the implied warrant of habitability in apartment 609 would concern a "separate transaction" from her duty to pay rent for apartment 510, *Campos,* 464 A.2d at 133; *see also Griffith v. Butler,* 571 A.2d 1161, 1164 n. 4 (D.C.1990), and for this reason as well it would exceed the reach of Rule 5(b).[5]

The judge committed no error in limiting Killingham's claims for rent abatement to those arising after she moved into apartment 510.

### III.

Killingham, who ambulates by means of a wheelchair, contends that the trial judge unduly restricted her presentation of evidence that the Landlord had failed to adapt the common areas to take into account persons like herself who have a disability. The trial judge wrestled with this issue, seeking to reconcile the limited nature of defenses available in the Landlord and Tenant Branch, where "only those breaches by the landlord which constitute housing code violations may be asserted," *Mahdi v. Poretsky Management, Inc.,* 433 A.2d 1085, 1090 (D.C.1981),[6] with the fact

4. *See, e.g.,* RICHARD R. POWELL, POWELL ON REAL PROPERTY § 16.04[2] at 19–90 to 16–91 (Patrick J. Rohan ed., 1999) (noting that "[n]ormally, ... a periodic tenancy arises as a legal inference from a situation" such as when "the tenant takes possession under an invalid ... lease").

5. Killingham contends also that she should have at least been allowed to seek abatements for *common area* violations that predated the Landlord's claim for rent. However, she never argued this point to the judge nor objected to the jury instruction limiting consideration of rent abatements to violations occurring in October 1994 and afterwards. We find no plain error in the judge's failure *sua sponte* to treat the common areas differently from the apartment units in applying Rule 5(b). *See Weisman v. Middleton,* 390 A.2d 996, 1001 (D.C.1978); *see also Hines,* 449 A.2d at 1092 (under Rule 5(b), tenant may counterclaim for a rent abatement "not only for the period for which the landlord claims nonpayment of rent, but also for a prior period of *the tenancy*" (emphasis added)).

6. At the time of this litigation, the District's housing code contained no reference to physical disabilities of a tenant. The code was later amended to implement the requirements of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B) (1994). *See* "Procedures Regarding Requests for Reasonable Accommodation Under the Fair Housing Act," 45 D.C.Reg. 8057 (1998).

that at least some failures—such as to provide wheelchair access to the apartment building—would clearly be a breach of the implied warranty of habitability. Thus, the judge refused to let Ms. Killingham testify regarding the Landlord's failure to provide special ramp access to the common recreational area of the complex, including the pool, pointing out that her remedy for that failure to accommodate her disability lay elsewhere than in withholding rent; but in general he ruled that the alleged failure to provide her with effective ramp access to the apartment building itself could be placed before the jury. Killingham challenges the first exclusion as erroneous, and contends that the judge essentially took back the latter ruling by restricting her evidence that the wheelchair ramp to the building was partly blocked by a trash bin and had "dips" and "potholes" that impaired her access.

■■■ D.C.Code § 6–1706 (1995), although not part of the housing code *per se*, contains two relevant provisions:

(a) Blind persons and other physically disabled persons shall be entitled to full and equal access, as other members of the general public, to all housing accommodations offered for rent, lease, or compensation in the District of Columbia, subject to the conditions and limitations established by law or in accordance with law and applicable alike to all persons.

\*    \*    \*    \*    \*    \*

(c) Nothing in this section shall require any person renting, leasing, or providing real property for compensation in the District of Columbia to modify his property in any way or to provide a higher degree of care for a blind person or otherwise physically disabled person than for a person who is not physically disabled.

The mandate of subsection (a) may naturally be read—and we so read it—as imposing an obligation on rental housing providers to provide full access for disabled persons to a "housing accommodation," violation of which may be a defense to a suit for possession and back rent. On the other hand, the limitation of subsection (c) supports the trial judge's conclusion that, for the limited purposes of summary proceedings under Rule 5(b), the Landlord was not obligated to provide a wheelchair ramp to the recreation area including the pool. Killingham's remedy for any such failure to accommodate her lay in a different proceeding. *See, e.g.*, D.C.Code § 1–2515(a)(4) (1999).

■■■ Regarding her second argument, Killingham points to the judge's conclusion following argument on the issue that "[s]he has a right to be able to enter the building . . . . [but s]he does not have a right under *Javins* to withhold rent if entry for her is more difficult because of a wheelchair." This ruling, she contends, effectively barred her from testifying that the ramp access to the building itself was inadequate because of its obstructed and defective condition. We need not decide whether the judge sliced the matter too finely in distinguishing between no access by ramp and access made "more difficult" through obstructions or poor maintenance, for the distinction which the judge articulated did not, in fact, prevent Killingham from testifying about the defects that she claimed impaired her free use of the access ramp. She told the jury:

Because they had a big garbage bin blocking the only ramp to the building[,] I could not even go out to the rehab hospital to my therapy three times a week. The Metro access would come to pick me up, they couldn't even get me in and out without brushing up against the garbage bin and angling at an angle where those dips were, so it's caused my wheelchair wheels to come off, the front wheels.

No instruction the judge gave precluded consideration of this testimony by the jury. While the judge prevented Killingham from going into further detail about these conditions, the jury had an adequate basis

on which to consider the condition of the wheelchair ramp along with all of her other claims of substandard habitability.[7]

*Affirmed.*

RUIZ, Associate Judge, dissenting.

I would reverse and remand for further proceedings because, on the present record, I cannot conclude that Ms. Killingham, the tenant, was not harmed by the dismissal of her claim for housing code violations resulting from the late amendment to the landlord's complaint permitted by the trial court and by the trial court's refusal to consider the tenant's claim that, as a disabled person, she was unlawfully denied access to the apartment building's recreational pool area.

### 1. *The Dismissed Claim of Housing Code Violations.*

The landlord was permitted to amend its complaint so as to exclude a demand for back rent on a unit in the same building that Ms. Killingham had occupied immediately before she moved into the unit from which the landlord sought to evict her. As a result, Ms. Killingham's counterclaims for housing code violations related to that previous unit were dismissed. The trial court allowed the late amendment to the landlord's complaint believing that the tenant benefitted from the fact that, as a result of the amendment, she would not be liable for back rent due on the unit she previously occupied. Notably, the trial court also was of the view that, if she wished, Ms. Killingham could file the dismissed counterclaims in an independent action against the landlord. As the majority recognizes, the trial court was in error in this respect, because Ms. Killingham's claims were time-barred if she filed an independent action against the landlord.[1]

It is important to remember the framework for our appellate review. Where the trial court gives a reason for its ruling, we review the trial court's decision on the basis on which it was made. *See District of Columbia v. Shannon,* 696 A.2d 1359, 1367 (D.C.1997) ("Although we may affirm a trial court's exercise of discretion when the trial court has provided no explanation, we ordinarily must reverse an otherwise sustainable exercise of discretion if the trial court's ruling is manifestly based on 'erroneous legal thinking.'") (citations omitted). If we determine that the trial court's ruling was based on an erroneous premise, it is our appellate role to reverse; we may affirm only if we determine that

---

**7.** Killingham's remaining contentions require no extended discussion. First, the parties stipulated that service of the notice to quit had been proper. *See, e.g., Joyner v. Jonathan Woodner Co.,* 479 A.2d 308, 311 (D.C.1984); *Moody v. Winchester Management Corp.,* 321 A.2d 562, 563 (D.C.1974). Killingham's assertion that she personally (as distinct from her lawyer) never saw the stipulation does not matter. *See, e.g., Berenbaum v. Berenbaum,* 638 A.2d 681, 683 (D.C.1994). Second, the claim that Judge Weisberg revealed bias against Killingham which prejudiced her in the eyes of the jury is meritless. *See Mack v. Zalco Realty, Inc.,* 630 A.2d 1136, 1139 n. 6 (D.C.1993). Third, the trial court properly lifted the *Drayton* stay to allow the case to proceed under the existing (non-increased) rent. *See Drayton,* 462 A.2d at 1120, 1122. Fourth, the trial judge correctly concluded that the Landlord's alleged failure to maintain a rental housing license for a two-week period was irrelevant to the defense in this proceeding unless tied (as it was not) to specific breaches of the warranty of habitability. *See Curry v. Dunbar House, Inc.,* 362 A.2d 686, 689–90 (D.C.1976). Finally, Killingham's argument that the judge improperly allowed the jury to calculate abatements as percentages of only the rent portion she personally paid ($217) is made for the first time in her reply brief, and we therefore decline to consider it. *See Johnson v. District of Columbia,* 728 A.2d 70, 75 n. 1 (D.C.1999); *District of Columbia v. Patterson,* 667 A.2d 1338, 1346 n. 18 (D.C. 1995).

**1.** The trial court could have ensured that Ms. Killingham would have been able to file her complaint by conditioning the landlord's amendment on waiver of a statute of limitations defense, akin to the procedure used when a case is dismissed for *forum non conveniens. Cf. Guevara v. Reed,* 598 A.2d 1157, 1160 (D.C.1991) (noting that availability of alternative forum is a requirement before case is dismissed for *forum non conveniens* ).

the trial court's error was harmless to Ms. Killingham, see *Johnson v. United States,* 398 A.2d 354, 366–67 (D.C.1979), or if, on the record, the trial court had no option but to rule as it did. *See Shannon,* 696 A.2d at 1367.

No one contends that the trial court's only option in this case was to allow the landlord to amend its complaint and dismiss Ms. Killingham's related housing code claims. It is also clear that the trial court's reasoning was erroneous because, contrary to the trial court's view, the tenant's dismissed claims were time-barred. Such an error in a significant component of the trial court's consideration would constitute abuse of discretion requiring reversal unless we can determine on appeal that the tenant was not prejudiced as a consequence. *See Johnson, supra,* 398 A.2d at 366–67. In this case, that determination requires an evaluation of the dismissed claim for housing code violations with respect to the apartment previously occupied by the tenant.

The majority reasons that the jury's verdict shows that Ms. Killingham was not harmed by the fact that she lost her claim of housing code violations in the first unit she occupied. In an after-the-fact analysis, the majority estimates roughly how much the jury would have awarded the tenant for the lost claim, based on the amount the jury awarded the tenant for the "same" housing code violations during a longer period that she occupied the second unit (the one from which she was evicted). Then, the majority concludes that the amount it estimates Ms. Killingham may have "lost" in her dismissed counterclaims with respect to the first unit, she more or less made up with the back rent due on that unit that the landlord forwent when it amended its complaint.

I disagree with the majority that the record supports that Ms. Killingham was not harmed by the loss of her claim with respect to the first unit she occupied in the building. The rough calculation of damages that the majority estimates Ms. Killingham would have been awarded had her housing code violations not been dismissed suggests appellate fact-finding. Moreover, on appeal, the issue is not whether the ruling would cause *undue* prejudice, a proper factor in the trial court's initial discretionary judgment,[2] *see Blake Constr. Co. v. Alliance Plumbing & Heating Co.,* 388 A.2d 1217, 1220 (D.C.1978), but whether the trial court's erroneously-based ruling was *harmless. See Johnson, supra,* 398 A.2d at 367 ("[T]he reviewing court must weigh the severity of the error against the importance of the determination in the whole proceeding and the *possibility* for prejudice as a result.") (emphasis added). Here, the trial court was wrong in believing that the dismissed claim could be brought in a separate action, and, as dismissal eliminated the claim altogether, there is possible prejudice unless the tenant's claim has no value.[3]

---

2. Even though it may have been proper for the trial court to have engaged in a fairly rough appraisal of Ms. Killingham's claim at the time it permitted the late amendment and determined that any loss to Ms. Killingham would be *de minimis,* that is not the issue before us. The point is that the trial court did not engage in such an appraisal because it could not have done so at the time it dismissed the tenant's claim, in advance of the jury verdict. Therefore, the majority incorrectly considers the jury verdict in concluding that the trial court's discretionary ruling allowing amendment of the complaint and dismissing the tenant's claim was permissible because it did not "unduly" prejudice the tenant.

3. Of course, as the tenant's disability-based claim has not been evaluated by the jury with respect to *either* of the two apartment units at issue, *see infra,* there is no basis in the record upon which the trial court or this court could conclude that the loss of that part of her counterclaim had no value because it was offset by the benefit that she derived from not having to pay back rent due on one of the apartment units.

## 2. *The Disability Claim.*

Ms. Killingham contended that she was prevented from using a common area of the building to which she was entitled under her lease, the pool area, because the landlord unlawfully failed to provide wheelchair access, as required by D.C.Code § 6–1706 (1995). This is a violation she claims existed throughout the time she occupied two different units in the building. The trial court did not permit that claim to be considered by the jury as a possible offset against her rent obligations with respect to either of the units she occupied.[4]

The majority concludes that even though it interprets section 6–1706 as requiring that the landlord provide full access for disabled persons to a "housing accommodation," the tenant's claim that there was no wheelchair access to the pool area is not a proper defense to a suit for possession and back rent under Superior Court Landlord & Tenant Rule 5(b). The majority does not support this conclusion other than by reference, without explanation, to the caveat in section 6–1706(c) that a landlord is not required to "modify his property in any way or to provide a higher degree of care for a ... physically disabled person than for a person who is not physically disabled"—a general provision that would apply equally if there had been no wheelchair access to the apartment building or to the apartment unit itself. However, the majority appears to support the trial court's determination, correct in my view,

that lack of wheelchair access to the apartment building constitutes a proper defense, for a tenant who uses a wheelchair, in a Rule 5(b) proceeding for back rent. Although I agree that a summary proceeding under Rule 5(b) is not the place to determine the scope of the landlord's obligation under section 6–1706(a), as modified by (c), I disagree with the majority that if it were determined that the law required wheelchair access to the pool area, the lack of such access would not be a defense for a disabled person using a wheelchair in a Rule 5(b) proceeding.[5] Housing code violations to "common areas" are properly asserted as a defense in a summary proceeding, *see Javins v. First Nat'l Realty Corp.*, 138 U.S.App. D.C. 369, 380–81 & n. 62, 428 F.2d 1071, 1082 & n. 62 (1970), and presumably the apartment building's recreational pool area is an area provided for the common use of the tenants. Moreover, in *Shin v. Portals Confederation Corp.*, 728 A.2d 615 (D.C.1999), this court appears to have expanded somewhat the traditionally narrow view of the type of defense that a tenant may assert in a summary Rule 5(b) proceeding by requiring, on pain of preclusion, that a tenant *must* assert as a defense claims for damages to the lessee's business resulting from the landlord's breach of a commercial lease. *See id.* at 618–19. To the extent that the majority reasserts the narrow scope of defenses permissible in a Rule 5(b) proceeding, I welcome it. *See id.* at 621–22 & n. 5 (Ruiz, J., dissenting).[6]

---

**4.** Had the tenant not paid any rent with respect to either unit, one could conclude that elimination of the obligation to pay rent fully compensated her for this, as well as all other, housing code violations. The record in this case, however, is that the tenant paid rent for ten years and only stopped rent payments for approximately six months in order to force the landlord to correct housing code violations. Instead of correcting the housing code violations, the landlord relocated Ms. Killingham to another unit, which the jury found to be in violation of the housing code.

**5.** In this case, where in the trial judge's view, the claim "partially fits but to some extent exceeds" the proper scope of Rule 5(b), the

Landlord and Tenant Court should have dismissed the pool-related claim without prejudice or referred it to the Civil Branch. *Mathis v. Barrett*, 544 A.2d 287, 288–89 (D.C.1988).

**6.** In *Shin*, the tenant initially asserted his claims for breach of contract and then withdrew them after the landlord argued to the court that they exceeded the narrow scope of permissible claims in a summary Rule 5(b) proceeding for possession and back rent. When the tenant subsequently filed a breach of contract action making the same claim he had been induced to withdraw in the summary Rule 5(b) action, the landlord took the position that the fact that Shin's claims had not been raised in the decided action for

For the foregoing reasons, I do not agree that the tenant has not been harmed by the trial court's dismissal of her unappraised, uncompensated, and time-barred housing code claims with respect to the unit she previously occupied, and her related claim of lack of wheelchair access to the common pool area. I would reverse and remand the case for further proceedings, at which time the trial court could develop the record and, if appropriate, determine whether Ms. Killingham suffered harm from the loss of those claims.[7] If she was harmed, she must be allowed to proceed, if she desires, with the substance of her claims against the landlord.

possession and back rent rendered them *res judicata*. This court agreed, stating that even though the landlord had objected to the claims in the Rule 5(b) proceeding, the tenant should nonetheless have reasserted the claim in the same proceeding as a defense to the action for possession and back rent. *See Shin*, 728 A.2d at 619. The facts in this case ominously point to a similarly unfair result: The tenant asserted her claim that the lack of wheelchair access to the pool area entitled her to a rent offset. The landlord argued that the claim was not proper in a Rule 5(b) proceeding, and the trial court agreed that the claim was not a "housing code" violation that could mitigate the obligation to pay rent. On appeal, this court states that the tenant's remedy for the claim related to the building's recreational area lay in a different proceeding—without considering that if the tenant

had separately filed such a claim, it would have been time-barred with respect to the time the tenant was paying rent, prior to 1994. *Cf. supra* note 1.

7. As the lease is not part of the record on appeal, on remand, I would also have the trial court determine the facts hypothesized by the majority of "the possibility—indeed, the probability—that the lease [Killingham] had signed was specific to" the apartment unit she had earlier occupied in the building and did not cover the unit that was the subject of the summary Rule 5(b) proceeding. *See ante* at 809. Determination of that factual issue would be relevant to whether Killingham's claims with respect to housing code violations in the previous unit "related to the premises" from which the landlord sought to evict her. Super. Ct. L & T R. 5(b) (1999).